IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:
JAGUAR LAND ROVER NORTH AMERICA,
LLC                                         :

    v.                                      :    Civil Action No. DKC 08-1599

                                            :

MANHATTAN IMPORTED CARS, INC.
                                            :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this breach of contract case are (1) a motion for summary judgment filed by Plaintiff Jaguar Land Rover North America, LLC (Paper 61) and (2) a motion to seal exhibits filed by Defendant Manhattan Imported Cars, Inc. (Paper 65). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Plaintiff's motion will be granted in part and denied in part. Defendant's motion will be granted.

## I.    Background

The facts viewed in the light most favorable to the Defendant, the non-moving party, are as follows. Plaintiff Jaguar Land Rover North America, LLC ("JLRNA") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New Jersey. (Paper 1 ¶ 1). Plaintiff is the exclusive distributor

of Jaguar and Land Rover products in the United States. (*Id.* at ¶¶ 10, 12). Defendant Manhattan Imported Cars, Inc. ("Manhattan") is incorporated in the State of Maryland with its principal place of business in Rockville. (*Id.* at ¶ 2) Manhattan's president and sole shareholder is John Jaffe. Manhattan operates as a Land Rover and Jaguar dealer pursuant to agreements between Manhattan and JLRNA or its predecessors. (Paper 66 at 2.)[1] Manhattan also operates as a Lincoln-Mercury dealer. (*Id.*). The parties' dispute arises from JLRNA's decision in 2008 to suspend certain incentive payments to Manhattan under its "Business Builder Program" and JLRNA's failure to reimburse a number of Manhattan's warranty claims

The Business Builder Program is an incentive program under which a dealer can earn bonus payments of up to six percent of the Manufacturer's Suggested Retail Price ("MSRP") from JLRNA for each Jaguar or Land Rover it sells if the dealer meets

---

[1] Prior to 2008, Land Rover vehicles were distributed in the United States by Land Rover North America, Inc. ("LRNA"), a subsidiary of Ford Motor Company. Jaguar vehicles were distributed by the Jaguar division of Ford. A single Ford business unit called "Aston Martin Jaguar Land Rover" was responsible for distribution of both brands. In 2008, Ford sold the Jaguar and Land Rover brands to Tata Motors Ltd, an Indian company.

certain criteria, including facility-related requirements. The facility-related incentive payments can total up to three percent of MSRP. (Paper 62, Exhibit 19, at 2 and Exhibit 20, at 2). To qualify for the facility-related incentive payments, dealers must have either an approved facility or an approved facility plan that details the process by which the dealer will obtain or construct an approved facility. *(*Paper 62, Exhibit 19, at 3 and Exhibit 20, at 3). Approved facility plans typically include project milestones, culminating with the opening of an approved facility at milestone five. If a dealer misses any project milestone by more than ninety days, it can be classified as "at risk" and JLRNA has the option to suspend that dealer's incentive payments. (Paper 62, Exhibit 19, at 4 and Exhibit 20, at 4).

The key events relevant to the present motions began in 2006. Prior to 2006, Defendant operated Jaguar and Lincoln Mercury franchises in one "dualled" location in Rockville, Maryland. (Paper 62, at 5, Paper 66, at 3). In May of 2006, Defendant acquired a Land Rover franchise from third party Land Rover Rockville and executed a Land Rover Dealer Agreement with JLRNA's predecessor Land Rover North America ("LRNA"). (Paper 62, at 5-6, Paper 66, at 3-4). Because LRNA was a not a

party to Defendant's buy-sell agreement with Land Rover Rockville, it was also necessary for LRNA and Defendant to execute the "Land Rover Letter of Intent" ("LOI") which contained terms governing the parties' rights and responsibilities after Defendant acquired the franchise. At the same time, Defendant and Jaguar Cars signed an "Amendment to the Jaguar Performance Agreement" ("PA") to reflect the addition of the Land Rover franchise to Defendant's facility. (Paper 62, at 5-6, Paper 66, at 3-4). The LOI and PA were signed by Defendant on May 2, 2006. (*Id.*). On May 16, 2006, Defendant closed on its buy-sell agreement with Land Rover Rockville and proceeded to execute the Land Rover Dealer Agreement with LRNA pursuant to which Defendant was authorized to commence operations as a Land Rover dealer. (Paper 62, at 9).

The Land Rover LOI and Jaguar PA both outlined the renovations of Defendant's dealership facilities that were necessary in order for Defendant to qualify for facility-related Business Builder incentive payments. The parties' original plan called for Defendant to operate at its existing location on Old Georgetown Road in Rockville with certain initial renovations to the design and décor to accommodate Jaguar and Land Rover's requirements followed by construction of a larger facility to

4

house only Land Rover and Jaguar vehicles. (Paper 62, Exhibits 15 and 17). The LOI and PA included a set of common milestones that culminated with a January 1, 2008, deadline for Defendant to have completed all site work and renovations and be open for business as a Jaguar/Land Rover Centre. (*Id.*). Each agreement also contained a paragraph entitled "Relocation of Lincoln Mercury" wherein Defendant agreed to "relocate [its] Lincoln Mercury operations out of the 11617 Old Georgetown Road facility" by either January 1, 2008, or, at the latest, July 1, 2008. (Paper 62, Exhibit 17 ¶ 3 and Exhibit 15 ¶ 4). The relocation paragraph included the following language:

> You understand that [Land Rover and Jaguar] would not have entered into this Agreement, but for your commitment to relocate your Lincoln Mercury operations out of the 11617 Old Georgetown Road facility. If you fail to relocate your Lincoln Mercury operations out of the Old Georgetown Road facility under the terms of this agreement, you further understand that any such failure may result in your immediate ineligibility to receive payments under the Business Builder incentive program (or such other similar incentive program as may be subsequently adopted) to the extent that such an incentive program requires an approved facility or has other facility prerequisites.

*(Id.).*

Although Defendant successfully completed the first project milestone, by early 2007 it had fallen behind and sought to reach an agreement with Plaintiff to extend the remaining milestone deadlines. Plaintiff proposed new deadlines in a February 16, 2007, email and followed up with a revised LOI and PA for Defendant's consideration on April 5, 2007. (Paper 62, Exhibits 23 and 24). In the proposed amendments, Plaintiff extended the deadline for completion of the renovations from January 2008 until September 2008. (*Id.*). Defendant did not sign the new agreement and instead requested a meeting with Plaintiff, which took place in August 2007. At that time, Defendant apprised Plaintiff of an opportunity it was pursuing to relocate the Jaguar Land Rover dealership to the ground floor of a mixed-use, high-rise project being developed near the White Flint metro station in Montgomery County (the "White Flint Project"). To facilitate Defendant's pursuit of this opportunity, Plaintiff again revised the project milestones and sent proposed amendments to Defendant in late October 2007. (Paper 62, Exhibit 25). These proposed amendments gave the parties until September 2008 to evaluate the White Flint Project opportunity, but gave Plaintiff sole discretion in deciding whether to pursue the opportunity and retained the requirement

that Defendant remove the Lincoln Mercury franchise by September 2008. (*Id.*). These amendments were also rejected by Defendant in November 2007. (Paper 62, Exhibit 26). The parties met again in February 2008 to attempt to negotiate new deadlines, and following that meeting Plaintiff sent the third revised LOI and PA to Defendant. (Paper 62, Exhibits 27 and 28). This third revision extended the deadline for removal of the Lincoln Mercury franchise until December 2008. (Paper 62, Exhibit 27). In an email dated April 15, 2008, Defendant informed Plaintiff that it would not sign the proposed amendments and stated its belief that the agreements made two years ago were "obsolete." (Paper 62, Exhibit 29).

By letter dated April 30, 2008, Plaintiff gave Defendant notice of its intention to suspend, as of July 1, 2008, facility-related incentive payments for any Land Rover and Jaguar vehicles sold. (Paper 62, Exhibit 30). In response, Defendant's lawyers sent a letter dated May 30, 2008, claiming that Plaintiff's suspension of the payments violated Maryland law and threatened legal action. (Paper 62, Exhibit 31).

Also at issue here is Plaintiff's warranty reimbursement policy. Count VII of Defendant's counterclaims alleges in part that Plaintiff failed to reimburse Defendant's warranty claims

in accordance with the parties' agreements. (Paper 11 at ¶¶ 74-76). Plaintiff's warranty reimbursement policies and procedures include specific details and a timeline for dealer's submission of claims and returned parts. Typically, a dealer will not be reimbursed for warranty claims if the displaced parts are not returned to Plaintiff in a timely manner. Defendant alleges, however, that Plaintiff granted a one-time waiver of the return deadline for Defendant's warranty claims from August 2006 to March 2008. (Paper 66, at 45).

On June 19, 2008, Plaintiff filed its complaint seeking a declaratory judgment that its suspension of Defendant's incentive payments was lawful. (Paper 1). Defendant answered on July 23, 2008, and asserted eight counterclaims.[2] (Paper 11). Defendant's remaining counterclaims seek (1) reformation of the parties' agreements to require Plaintiff to make the facility-related payments irrespective of whether Defendant has an approved facility or facility plan (count II); (2) damages for breach of contract (count III); and (3) damages for violation of sections 15-207(b) and (d); section 15-206.1, and section 15-212.1 of the Maryland Transportation Code (counts IV-VII). On

---

[2] Defendant voluntarily dismissed counts I and VIII of its counterclaims on May 1, 2009. (Papers 49 and 50).

October 30, 2009, Plaintiff filed a motion for summary judgment on its request for a declaratory judgment and Defendant's counterclaims. (Paper 61). Defendant opposes this motion. (Paper 65). In addition, Defendant filed a consent motion to seal certain exhibits filed in support of its opposition to Plaintiff's motion for summary judgment. (Paper 65).

## II. Motion for Summary Judgment

### A. Standard of Review

Plaintiff has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, if there clearly exists factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.* Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. (citations omitted).

## B.  Analysis

### 1.  Declaratory Judgment

Plaintiff seeks a declaratory judgment that Defendant is not entitled to facility-related incentive payments under the terms of the parties' agreements and, therefore, Plaintiff was entitled to suspend its payment of these incentives in July 2008.  Defendant counters that the relevant portion of the parties' written agreement is no longer in effect.

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the court must consider three factors in determining whether to grant declaratory relief:

> (1) the complaint must allege an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court must possess an independent basis for jurisdiction over the parties; and (3) the court must decide whether to exercise its discretion to determine or dismiss the action.

*Proa v. NRT Mid Atlantic, Inc.*, 477 F.Supp.2d 677, 680 (D.Md. 2007)(internal citations omitted).  Here, the first two requirements are not disputed by the parties and are clearly met.  Plaintiff has established an actual controversy, *see Volvo Constr. Equip. North America, Inc. v. CLM Equip. Co.*, 386 F.3d 581, 593 (4th Cir. 2004)(finding an actual controversy where a

Volvo dealer sought declaratory relief in order to avoid the accrual of potential damages for past actions related to its dealer agreement), and this court has diversity jurisdiction over the parties.  The remaining question is whether Plaintiff has made its case on the merits.

The parties agree that the Land Rover Dealer Agreement (Paper 62, Exhibit 18), the Land Rover Letter of Intent (Paper 62, Exhibit 17), the Jaguar Dealer Agreement (Paper 62, Exhibit 13), the Amendment to the Jaguar Performance Agreement (Paper 62, Exhibit 15), and the Business Builder Program rules (Paper 62, Exhibits 19 and 20) constitute agreements between the parties.  Their disagreement relates to whether all of these agreements remain in effect and whether they accurately reflect the content of the parties' contract.  Plaintiff contends that all of the agreements remain in effect and that they must be viewed in concert to understand fully the parties' rights and obligations.  (Paper 70, at 3-5).  Defendant counters that the Land Rover LOI was superseded by the later dated Land Rover Dealer Agreement, which had an integration clause nullifying any prior agreements between the parties.  (Paper 66, at 9-10).  Defendant also asserts that the written agreements do not

accurately reflect the terms of the parties' contract and should be reformed. (*Id.* at 29).

Whether an agreement is integrated and the effect of an integration clause are preliminary questions of interpretation determined by the court. *See Shoreham Developers Inc. v. Randolph Hills Inc.*, 248 Md. 267, 271-272 (1967)(interpreting meaning of integration clause in one of two written instruments between the parties; *see also* Restatement (Second) of Contracts §§ 209(2), 210(3) (1981).[3] The presence of an express integration clause does not resolve definitively the question of whether the parties' agreement is a complete integration. As noted in *Shoreham*, "even the sentence 'This contract contains the final and entire Agreement between the parties,' may embody a recital of facts which may be untrue." 248 Md. at 272. The circumstances of the instruments' drafting and the content of the written instruments provide guidance to interpret the scope of the parties' agreement.

_____

[3] The parties assume without any discussion that Maryland contract law applies. Maryland generally applies the principle of *lex loci contractus*, whereby the law of the jurisdiction where the contract was made controls its validity and construction. *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390 (1988). The contract at issue was formed when the documents were signed by Defendant in Rockville, Maryland, thus Maryland contract law governs questions of validity and interpretation.

> Where several instruments are made a part of
> a single transaction they will all be read
> and construed together as evidencing the
> intention of the parties in regard to the
> single transaction. This is true even
> though the instruments were executed at
> different times and do not in terms refer to
> each other.

*Rocks v. Brosius*, 241 Md. 612, 637 (1966); *see also Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 415 (1989).

Here, although several of the documents contain integration clauses, the totality of circumstances indicates that the agreements were meant to be read and construed together. Three of the agreements, the Land Rover LOI, the Jaguar PA, and the Land Rover Dealer Agreement were submitted to Defendant for signature at the same time. (Paper 70, Exhibit 44 (April 21, 2006 email from Plaintiff to Defendant enclosing "agreement package" containing the standard Land Rover Dealer Agreement, Land Rover Standard Terms and Conditions, Land Rover LOI, and Jaguar PA)). The Land Rover Dealer Agreement was executed a few days later than the Land Rover LOI only because it could not take effect until Defendant had finalized its buy sell agreement with a third party.

Defendant argues that the language in the May 16, 2006, Land Rover Dealer Agreement, stating that it "cancels,

supersedes and annuls any prior contract, agreement, or understanding" between Land Rover and Defendant means that the Land Rover LOI, dated May 2, 2006 was cancelled by the execution of the Land Rover Dealer Agreement. But Maryland has long recognized that such clauses will only be read to annul or cancel a prior agreement where the later agreement was executed by the same parties and related to the exact same subject matter. *See* G.*M. Pusey & Assocs., Inc. v. Britt/Paulk Ins. Agency, Inc.,* 2008 WL 2003747, *5 (D.Md. 2008)(citing *Hercules Powder Co. v. Harry T. Campbell Sons Co.,* 156 Md. 346 (1929)). Here each agreement does not cover the same subject matter and the Land Rover Dealer Agreement on its own is insufficient to explain the full extent of the parties' obligations. The Land Rover LOI and the Jaguar PA discuss facility specific requirements, whereas the Land Rover Dealer agreement governs the terms of the franchise-dealer relationship.

Further evidence that the agreements are to be viewed together is found in the terms of the Land Rover Dealer Agreement itself. In Article 4, the Dealer Agreement states that the facility requirements are governed by "the attached Dealer's Facility and Location Exhibits." (Paper 62, Exhibit 18 at Art 4.3-4.4). Yet, no Dealer Facility or Location Exhibits

were attached to the Dealer Agreement. Indeed the only agreements discussing facility requirements are the Land Rover LOI and Jaguar PA. (*See* Paper 62, Exhibits 15 and 17). For all of these reasons, the parties' written agreement, viewed as a collective whole, constitute the parties fully integrated agreement.

When considering the written agreements as whole, the express language of the parties' contract authorized Plaintiff to suspend the incentive payments. The Land Rover LOI, the Jaguar PA and the Business Builder Program rules all make clear that failure to satisfy the facility requirements will result in a suspension of the facility-related incentive payments. (*See* Paper 62, Exhibit 15, at 3; Exhibit 17, at 3; Exhibit 19, at 4, and Exhibit 20, at 4). In accordance with this language, Plaintiff was entitled to suspend incentive payments in 2008 after Defendant failed to meet many facility-related project milestones.

### 2. Breach of Contract

Plaintiff also seeks summary judgment on Defendant's breach of contract counterclaim (count III). This counterclaim is the reverse of Plaintiff's declaratory judgment claim. The crux of Defendant's argument is that it was entitled to facility-related

incentive payments according to the parties' agreement and Plaintiff's suspension of those payments constituted a breach of contract.

To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). Under the objective theory of contracts, which applies in Maryland,

> [A] court is to determine from the language of the agreement, what a reasonable person in the position of the parties would have understood the contract to mean at the time the contract was entered into; when the language of the contract is plain and unambiguous, there is no room for construction as the courts will presume that the parties meant what they expressed.

*Mathis v. Hargrove*, 166 Md.App. 286, 319 (2005).

As explained above, under the express language of the LOI and PA, Defendant had to have an approved facility or an approved facility plan in order to receive facility-related incentive payments. Defendant's facility did not adhere to the requirements laid out in the LOI and PA. Plaintiff was entitled to suspend the incentive payments under the terms of the parties' contract, and was not in breach of them.

### 3.  Reformation

In count II of its counterclaims, Defendant seeks reformation of the parties' agreement so that (1) Plaintiff is contractually obligated to continue to make full payments to Defendant under the Business Builder incentive program and (2) Defendant will not be obligated to remove the Lincoln Mercury franchise or make any of the other facility modifications outlined in the Land Rover LOI and Jaguar PA.  Plaintiff now seeks summary judgment on this count arguing that Defendant has not set forth a factual or legal basis to justify reformation.

Reformation is an equitable remedy that is only warranted when one of two circumstances exists:  "either there must be mutual mistake, or there must be fraud, duress, or inequitable conduct." *Maryland Port Admin. v. John W. Brawner Contracting Co.*, 303 Md. 44, 59 (1985); *see also Julian v. Buonassissi*, 414 Md. 641, n.15 (2010)("when a competent person signs a contract or disposes of his or her property in the absence of fraud, misrepresentation, mistake, undue influence, or fiduciary relations, the contract will be enforced.")  "The burden on a party seeking reformation is substantial and must overcome the rebuttable presumption that deliberately prepared and executed

written instruments accurately reflect the parties' true intentions." 28 Williston on Contracts § 70:209 (4th ed.)

Here there is no evidence of mutual mistake; Plaintiff seeks to enforce the agreements as written. Defendant must therefore, identify some evidence of fraud, duress, or inequitable conduct sufficient to create a genuine issue of material fact. To that end, Defendant asserts that Plaintiff made a number of inaccurate or false statements throughout the parties' negotiations that ultimately persuaded Defendant to sign the agreements. Defendant relies primarily on affidavits of its employees as evidence of Plaintiff's statements and oral promises. Assuming these statements are true, Defendant still has not set forth evidence sufficient to establish fraud, duress, or inequitable conduct in the formation of the contract, and thus reformation is not warranted.

Defendant argues that Plaintiff made misrepresentations about the future profitability of the Land Rover dealership that induced Defendant to purchase the franchise from a third party and sign the Land Rover Dealer Agreement and Land Rover LOI. Estimates or projections of future profits are statements of opinion, however, and not fact. *Snyder v. Herbert Greenbaum & Assocs.*, 38 Md.App. 144, 148-49 (1977); *Polson v. Martin*, 228

19

Md. 343, 346 (1962). Although not binding authority, a unpublished opinion from this court considering alleged violations of the Maryland Franchise Registration and Disclosure Law in instructive on this point. *See Flynn v. Everything Yogurt*, Civ. A. No. HAR92-3421, 1993 WL 454355, (D.Md. September 14, 1993). In *Flynn*, the court considered alleged violations of the Maryland Franchise Registration and Disclosure Law, Md. Code Ann. § 14-227-229, which regulates fraud, deceit, and untrue statements or omissions of material fact in connection with an offer to sell or the sale of a franchise. The plaintiffs in *Flynn* asserted that the franchisor, Everything Yogurt, had made misrepresentations when convincing the plaintiffs to purchase a franchise, including inaccurate projections of future profits. *Id.* at *2. The court granted defendant's motion to dismiss this claim holding that the projections of future earnings, even though inaccurate, did not constitute fraud or inequitable conduct in violation of the statute. *Id.* at *8; *see also Layton v. Aamco Transmissions, Inc.*, 717 F.Supp. 368, 371 (D.Md. 1989)(holding that projections cannot constitute fraud because they are not susceptible to exact knowledge at the time they are made).

Plaintiff's allegedly inaccurate projections of Land Rover's future profitability and inaccurate planning volumes could only be considered fraudulent if there was evidence that the plaintiff knew they were inaccurate at the time they were made. Here, Defendant has adduced no evidence that Plaintiff knowingly offered inaccurate projections. Moreover, John Jaffe, the president and sole stakeholder of Manhattan, testified that he considered the planning volumes to be "guestimates" indicating that even Defendant knew these numbers were just opinions and not fact. (*See* Paper 70, Exhibit 46). Without any evidence of intent to deceive, these statements of opinion do not justify reformation.

Defendant's remaining bases for reformation relate to actions taken after the agreements were signed. Specifically, Defendant asserts that the agreements should be reformed to reflect revised post 2006 Jaguar and Land Rover planning volumes for automobile sales and to reflect Plaintiff's alleged waiver of the milestone deadlines in the facility plan and the requirement that the Lincoln Mercury franchise be relocated. (Paper 66 at 29).

Defendant's arguments reflect a misunderstanding of the purpose and limits of reformation. Reformation is a two step

process.  The party seeking reformation must establish that (1) the contract as written should not be enforced, either because of a mutual mistake, or duress or inequitable conduct, and (2) "there is clear, convincing and satisfying proof of a mutual understanding and bargain that has not been accurately expressed." *City of Baltimore v. De Luca-Davis Constr. Co.*, 210 Md. 518, 524, (1956).  Reformation is a not a vehicle for rewriting contracts to reflect changed circumstances since the time of contract formation. *See Janusz v. Gilliam*, 404 Md. 524, 534 (2008)("no party has a right to rescind or modify a contract merely because he or she finds, in the light of changed conditions, that he or she has made a bad deal.")(internal quotations citations omitted).

Here, Defendant has produced no evidence that the parties agreed to terms different from those contained in the written agreements.  Plaintiff proposed amendments on several occasions, but Defendant refused to sign any of the proposals.  Defendant seeks to insert new terms, to which Plaintiff has not assented, into the parties' original agreement to reflect events occurring after the contract's formation.  Reformation cannot be applied to alter contractual terms in this fashion.

### 4.  Maryland Transportation Code Violations

Plaintiff also seeks summary judgment on each of Defendant's counterclaims asserting violations of the Maryland Transportation Code.  Defendant has alleged violations of Sections 15.207(b), 15-207(d), 15-206.1, and 15-212.1 of the Transportation Code.

### a.  Sections 15.207(b) and 15.207(d)

Subsections 15.207(b) and 15.207(d) of the Transportation Code prohibit franchisors from coercing dealers into making agreements and from coercing or requiring dealers to remove existing franchises or to alter dealership facilities or operations in a manner that imposes substantial financial hardship on the dealer.  Subsection b states that "a manufacturer, distributor, or factory branch, whether directly or through an agent, employee, affiliate, or representative, may not coerce any dealer to make any agreement with the manufacturer, distributor, or factory branch or their agent, employee, affiliate, or representative."  Md. Code Ann., Transp. § 15-207(b) (2010).  Subsection d elaborates on the types of agreements that cannot be forced upon dealers through coercion and states that:

> A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, affiliate, or representative, may not require or coerce a dealer, by franchise agreement or otherwise, or as a condition to the renewal or continuation of a franchise agreement, to:
>
> (1) Exclude from the use of the dealer's facilities a dealership for which the dealer has a franchise agreement to utilize the facilities; or
>
> (2) Materially change the dealer's facilities or method of conducting business if the change would impose substantial financial hardship on the business of the dealer.

Md. Code Ann., Transp. § 15-207(d) (2010). Coercion in the statute is defined as "(i) a means to compel or attempt to compel by threat of harm, breach of contract, or other adverse consequences." Md. Code Ann., Transp. § 15-207(a)(2)(i) (2006) (amended 2009). Coercion does not include "to argue, urge, recommend, or persuade." § 15-207(a)(2)(ii).[4]

The meaning of subsection 15-507(d)(2) was interpreted by the Maryland Court of Special Appeals in *Antwerpen Dodge Ltd. v. Herb Gordon Auto World, Inc.,* 117. Md.App. 290, 310 (1997).

_____

[4] Subsection 15-107(a) was amended effective June 1, 2009 and the definition of coercion was modified. Because the events at issue took place prior to June 1, 2009, the prior version of the statute, quoted here, is applicable.

> In order for coercion to exist within the
> meaning of this definition, the manufacturer
> must specifically undertake to change the
> dealer's conduct. This concept of coercion
> is similar to that utilized in the
> Automobile Dealers' Day in Court Act, 15
> U.S.C. § 1221, et seq. (Federal Dealers'
> Act). Specifically, the concept of coercion
> requires, at the very least, a demand by a
> manufacturer that is accompanied by a threat
> of sanctions for noncompliance.

The similarities between the Maryland Transportation Code and the Automobile Dealers' Day in Court Act ("ADDCA") were confirmed in *Colonial Dodge Inc. v. Chupler Corp.*, 11 F.Supp.2d 737, 744 (D.Md. 1996), *aff'd, 121 F.3d 697 (4th Cir. 1997)*("While there are slight differences between the state and federal statutes, "coercion" under both the State Act and the ADDCA embodies the same concept, and accordingly the same analysis applies.") In *Colonial Dodge*, Chrysler and Dodge dealers in Maryland asserted that they had been coerced into building a new showroom and coerced into abandoning their opposition to the placement of new dealerships in the area. *Id.* at 744. The court determined that there was insufficient evidence that the dealer was "confronted with a wrongful demand accompanied by a threat of sanctions for noncompliance" and found no violation of the statutes. *Id.* at 746.

It is generally accepted that a distributor's enforcement of the terms of its bargained-for agreement with a dealer is not "coercion." *See, e.g., Wagner & Wagner Auto Sales, Inc. v. Land Rover North America*, Inc. 539 F.Supp.2d 461, 473-74 (D. Mass), *aff'd on other grounds*, 547 F.3d 38 (1st Cir. 2008)(holding that franchisor's demands that the dealer comply with the facility obligations from its LOI did not constitute coercive conduct under ADDCA); *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 96-97 (2[d] Cir. 1987)(collecting cases holding that threats to take action authorized by parties' contract do not constitute coercion). In *Empire Volkswagen* for example, the Court of Appeals for the Second Circuit, held that the franchisor (World-Wide Volkswagen) could enforce the terms of its agreement with the dealer (Empire Volkswagen) to construct a separate facility for Volkswagen-Porsche-Audi cars without violating ADDCA so long as the contract terms were valid and reasonable. *Id.*

Here, Defendant argues that Plaintiff's insistence that Defendant remove the Lincoln Mercury franchise from its facility violates the Maryland law because Defendant is being coerced to remove a pre-existing franchise (§ 15-507(d)(1)) and to make material facility changes that will have an adverse financial

26

impact on Defendant (§ 15-507(d)(2)). Specifically Defendant argues that the provisions in the Jaguar PA and Land Rover LOI relating to the removal of the Lincoln Mercury franchise constitute wrongful demands, as did Plaintiff's later assertions that it intended to enforce these facility requirements. (Paper 66 at 22). Defendant further argues that Plaintiff's notification that it would withhold the facility-related incentive payments if Defendant did not comply was a threat of sanctions. (*Id.*). Plaintiff responds by arguing that it did not coerce Defendant, but rather it sought to enforce the parties' valid contract. Plaintiff also argues that it has not insisted that Defendant de-dual its facility, instead it has insisted that Defendant agree to and perform in accordance with an "approved facility plan", of which de-dualing is only one component. (Paper 70, at 6).

Plaintiff's conduct does not violate § 15-207 of the Transportation Code. As discussed above, the parties' agreement stated that Defendant had to meet specified facility requirements in order to qualify for certain incentive payments for sales of Land Rover or Jaguar models. This requirement is a reasonable contract term to which Defendant assented. Accordingly, Plaintiff's attempts to enforce this term, whether

by requesting that Defendant comply or by suspending the incentive payments, do not constitute coercion.

**b.    Section 15.206.1**

Section 15.206.1 of the Maryland Transportation Code requires a manufacturer or distributor (or their agents or employees) to act in good faith "(1) in acting or purporting to act under the terms, provisions, or conditions of any franchise agreement; or (2) in any transaction or conduct governed by this subtitle."   Md. Code Ann., Transp. § 15-206(b) (2010).   Good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." § 15-206.1(a).    The legislative history indicates that "the intent of the bill is to take the definition of 'good faith' under the Uniform Commercial Code (§ 2-103 of the Commercial Law Article) and apply it specifically to manufacturers in their dealings with franchised dealers."  (Paper 62, Exhibit 12).   The good faith obligation does not impose new or additional obligations on the franchising party, but rather "requires only that one party to a contract not frustrate the other party's performance."  *Lanham Ford v. Ford Motor Co.*, 273 F.Supp.2d 691, 694 (D.Md. 2003), *aff'd*, 101 Fed.Appx 381 (4th Cir. 2004), *cert. denied*, 543 U.S. 957.

28

Although there is little case law applying the good faith requirement of the Maryland Transportation Code, Defendant notes that several other states have passed analogous statutes imposing an obligation on automobile manufacturers and distributors to act in good faith (or not act in bad faith). (*See* Paper 66 at n.15)(citing statutes from Alabama, Georgia, Illinois, Maine, Missouri, New Hampshire, and South Carolina.) These state's interpretations of the good faith obligation, while not binding, provide a useful benchmark for analysis. In Georgia and Maine, for example, the courts held that a franchisor's actions were not in bad faith where they were motivated by legitimate business interest. *See Hickman v. American Honda Motor Co.*, 982 F.Supp. 881, 885-886 (N.D.Ga. 1997)( interpreting Ga. Code Ann. § 10-1-631 and holding that "Honda's rejection of the proposed franchise transfer of Town & Country was made with a legitimate business interest in mind and did not violate the statute), *aff'd*, 138 F.3d 958 (11th Cir. 1998); *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 63 (1st Cir. 1992)(interpreting Me. Rev. Stat. 10 § 1174.1 and finding no bad faith where dealer had made predictions about future profitability that proved inaccurate where dealer presented no evidence that franchisor was not

acting in accordance with legitimate business interests); *see also Diversified Foods, Inc. v. First National Bank of Boston*, 605 A.2d 609, 614 (Me. 1992)(finding summary judgment appropriate on bad faith claim under § 1-203 of U.C.C. where there were no facts "which directly, or through inference indicate that [a defendant] acted dishonestly, with ulterior motives, or for anything other than business reasons in exercising their rights under [an] agreement.").

Defendant argues that Plaintiff violated its good faith duties by not engaging in fair dealing and by failing to act with honesty in fact in requiring the removal of the Lincoln Mercury franchise and suspending the incentive payments. (Paper 66, at 17). In support Defendant highlights a case from the United States Court of the Appeals for the Seventh Circuit, *Shor-Line Rambler, Inc. v. American Motor Sales*, 543 F.2d 601 (7th Cir. 1976). In *Shor-Line Rambler*, the Seventh Circuit upheld a jury verdict finding that a manufacturer had acted in bad faith when it put unreasonable demands on a dealer to build new facilities, increase credit, and make extensive personnel changes and then terminated the franchise agreement when the dealer failed to satisfy these demands. *Id.* at 603-604. The situation in *Shor-Line Rambler* is distinguishable, however,

because in that case there was not a pre-existing contractual agreement whereby the dealer was obligated to make facility changes. Here, Defendant had consented to certain facility requirements in the Land Rover LOI and Jaguar PA.

Defendant also argues that because Plaintiff did not immediately suspend payments when Defendant missed its first facility milestone, Plaintiff thereby waived the facility requirements and could not enforce them at a later time without acting in bad faith. (Paper 66, at 17). This position is not supported by the evidence. The plain language of the Business Builder Incentive program manual states, "any waivers granted will be temporary and will have to be renewed each calendar quarter." (Paper 62, Exhibit 20, at 10). Defendant has not provided any evidence that Plaintiff intended to waive this requirement indefinitely.[5] To the contrary, on April 30, 2008 Plaintiff sent a letter providing written notice that it would begin enforcing the milestone provisions at the beginning of the following quarter. (Paper 62, Exhibit 30, Paper 66, at 18).

---

[5] In a footnote, Defendant argues that Plaintiff's failure to establish a new timeline for its facility plan milestones also constituted a breach of the agreement. (Paper 66, at n.17). Yet, Defendant has elsewhere conceded that Plaintiff attempted to negotiate new milestones but Defendant rejected Plaintiff's proposals. (Paper 66 and n. 18, Paper 62, Exhibit 30).

Plaintiff's prior lenience with respect to the facility requirements did not make its subsequent decision to enforce them an act of bad faith. In sum, Defendant has produced no evidence that Plaintiff failed to act in good faith.

**c. Section 15-212.1**

Section 15-212.1 requires a manufacturor or distributor to pay a dealer's claims "for any incentive or reimbursement program sponsored by the manufacturer, . . ., or distributor, under the terms of which the dealer is eligible for compensation." Md. Code Ann., Transp. § 15-212.1(a) (2010). Defendant has asserted two violations of Section 15-212.1: Plaintiff's failure to pay facility-related incentive payments and Plaintiff's failure to reimburse all of Defendant's warranty claims.

With respect to the incentive payments, the parties' positions are explained in detail in the analysis of the declaratory judgment and breach of contract claims. For the same reasons that Defendant's breach of contract claim fails, Defendant's claim that Plaintiff's failure to make facility-related incentive payments violated section 15-212.1 also fails.

The warranty reimbursement claim bears further analysis. Defendant has identified $129,734.76 worth of unpaid warranty

reimbursement claims that it contends Plaintiff is obligated to pay under § 15-212.1. (Paper 66, at n. 40).[6] Plaintiff seeks a summary judgment ruling that Defendant is not entitled to payment for any its unpaid warranty reimbursement claims. Plaintiff contends that no payments are due because Defendant has not complied with the policies and procedures of Plaintiff's warranty program which require submission of warranty claims and return of warranty parts in accordance with a specified timetable.

For a portion of the unpaid claims, Plaintiff has met its burden of establishing that Defendant is not entitled to relief. Specifically, Defendant has admitted that for $73,802.05 of it unpaid claims, it does not have parts to return. (Paper 70, Exhibit 48, Deposition of David Bohn). Defendant is not entitled to reimbursement for the return of parts it does not have. (*See, e.g.,* Paper 62, Exhibit 33 (Jaguar Warranty Policies and Procures Section G: Displaced Parts Procedures) and Exhibit 35 (Land Rover Warranty Policies and Procedures Section G: Displaced Parts Procedures)).

---

[6] Defendant initially asserted $132,860.20 in outstanding warranty claims, but has conceded that two previously paid claims were included in this total due to an accounting error. (Paper 66, at n.40).

The status of the remaining $55,932.71 in warranty claims is unclear. Although the parties have provided a list of the outstanding warranty claims, (Paper 62, Exhibits 37 and 38), Defendant has not indicated for which of the claims it has no parts to return and for which of the claims it has a part but Plaintiff has refused to accept it. In addition, Defendant identified some evidence that Plaintiff granted a waiver of its submission deadlines so that Defendant could submit late claims. (*See* Paper 66, Exhibit JJ (Jaffe Deposition), Exhibit KK, Exhibit TT). The scope and details of this waiver, including which of the unpaid claims it would cover, are not fully explained on the record. It is also unclear whether Defendant has supplied Plaintiff with the return labels needed to facilitate submission of the warranty parts. (Paper 66, at 46 and Exhibit JJ (Jaffe Deposition)).

Although Defendant has not clearly and succinctly demonstrated that it is entitled to warranty reimbursements, there is sufficient evidence that a reasonable jury could reach a verdict in favor of Defendant. Therefore, summary judgment in favor of Plaintiff will not be granted on this count.

## III. Motion to Seal

Defendant has filed a motion to seal several documents (Paper 65) in connection with its response to the motion for summary judgment. The motion must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties. Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court. If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

Local Rule 105.11. There is also a well established common law right to inspect and copy judicial records and documents. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). If competing interests outweigh the public's right of access, however, the court may, in its discretion, seal those documents from the public's view. *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

Furthermore, prior to sealing any documents, the court must provide notice of counsel's request to seal and an opportunity to object to the request before making its decision. *Id.* Either notifying the persons present in the courtroom or docketing the motion "reasonably in advance of deciding the issue" will satisfy the notice requirement. *Id*. at 234. Finally, the court should consider less drastic alternatives, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, the court should provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id*. at 235.

Defendant seeks to seal four exhibits. All are documents that Plaintiff produced with "confidential" or "attorney's eyes only" designations during discovery and they contain Plaintiff's sensitive and confidential financial data. (Paper 65 ¶ 2). The four exhibits are: (1) 2006 Release Land Rover Planning Volumes, (2) 2008 Release Land Rover Planning Volumes, (3) 2008 Release Jaguar Planning Volumes, and (4) 2008 Jaguar Forecast. (*Id.* at ¶ 6). Plaintiff has consented to the motion. (*Id.* at ¶ 5).

Defendant argues that these documents should be sealed to protect their sensitive and confidential financial information

and further notes that Plaintiff only agreed to produce these documents if their contents would be protected. (*Id.* at ¶ 7). Defendant argues that alternatives to sealing are not suitable because the information in the documents must be reviewed as a whole to provide proper context. (*Id.*).

Defendant has provided an adequate justification for its request to seal the four exhibits. Therefore, the motion to seal will be granted.

## IV.  Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment will be granted in part and denied in part. Defendant's motion to seal will be granted. A separate Order will follow.

```
               /s/
_____
DEBORAH K. CHASANOW
United States District Judge
```